## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 13-30049 |
| | ) | |
| QUENTIN LUCAS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ADOPTING REPORT AND RECOMMENDATION

SUE E. MYERSCOUGH, U.S. District Judge:

This cause is before the Court on Magistrate Judge Byron Cudmore's Report and Recommendation (d/e 22) that recommends denying Defendant Quentin Lucas's Pretrial Motion to Suppress Evidence and Statements (d/e 17). The Court ADOPTS Magistrate Judge Cudmore's Report and Recommendation (d/e 22) and DENIES Defendant's Motion to Suppress (d/e 17). The authorities performed a proper stop and search of the rental vehicle Defendant rode in as a passenger, police did not coerce Defendant's admission that the gun found in the trunk of the vehicle was his, and Defendant received and knowingly and intelligently waived his rights under Miranda. Miranda v. Arizona, 384 U.S. 436 (1966).

## I. BACKGROUND

On December 3, 2013, Magistrate Judge Cudmore held an evidentiary hearing on Defendant's Motion to Suppress. The Government presented the testimony of Illinois State Troopers Dustin Weiss and Steven Ent and Drug Enforcement Administration Special Agent Scott Giovannelli. Defendant testified on his own behalf. The Government also played the audio visual recording of a portion of the relevant December 3, 2012 traffic stop. The recording was made by the recording equipment in Trooper Weiss's vehicle and on his person. This recording equipment malfunctioned about fifteen minutes after Trooper Weiss commenced the traffic stop.

After reviewing the Report and Recommendation, listening to the audio recording of the evidentiary hearing before Judge Cudmore, and reviewing the Memoranda submitted by Defendant and the Government, the Court adopts the facts set forth by Judge Cudmore in his Report and Recommendation as the Court's own. A summary of those facts reflects that Defendant was a passenger in a rental vehicle driven by Andrew Craig. Authorities had conducted controlled heroin buys with Mr. Craig as the suspected heroin distributor. On December 3, 2012, at about 10:30 a.m., a detective with the Springfield Police Department contacted Illinois State Trooper Dustin Weiss regarding Mr. Craig. The detective told Trooper

Weiss that Mr. Craig would be traveling to Springfield in a black Dodge Charger and that Defendant Lucas would be in the car with Mr. Craig. The detective asked Trooper Weiss to stop the vehicle if Trooper Weiss established probable cause to do so.

At about 11:00 a.m. on December 3, 2012, Trooper Weiss contacted Illinois State Trooper Steven Ent, who handled a drug-sniffing dog named Zyko. Trooper Weiss asked Trooper Ent to be available that morning so that Zyko could conduct a canine sniff around a vehicle. Trooper Ent agreed to be available with Zyko.

Later that day, Trooper Weiss observed a black Dodge Charger heading west toward Springfield whose occupants matched the descriptions given by the detective. Trooper Weiss used a radar device to confirm that the vehicle was traveling 72 miles per hour in a 65 miles-per-hour speed zone. At that point, Trooper Weiss turned on his flashing lights and stopped the vehicle.

Mr. Craig was driving the vehicle, Defendant rode as a passenger, and a woman named Rayshana Grant rode in the back with her baby. Trooper Weiss told Mr. Craig that he had stopped Mr. Craig for speeding but that Trooper Weiss was only going to give Mr. Craig a warning. Trooper Weiss then collected Mr. Craig's and Defendant's identification and returned to

the patrol car to run checks on the Dodge Charger and the two men. By the time Trooper Weiss returned to his patrol car, Trooper Ent was parked behind Trooper Weiss and waiting. Zyko was in the car with Trooper Ent.

The checks revealed that the Dodge Charger was a rental vehicle, Mr. Craig and Defendant had criminal records, and that Defendant was the subject of an order of protection. The parties agree that Mr. Craig had rented the car. After these checks, Trooper Ent directed the driver, Mr. Craig, to come to Trooper Weiss's patrol car so Trooper Weiss could determine whether Ms. Grant and her baby were part of the order of protection against Defendant.

While Mr. Craig sat in the car, Trooper Weiss noticed that Mr. Craig was nervous. Specifically, Trooper Weiss noted that Mr. Craig had sweaty hands and nervously bounced his knee. When Trooper Weiss asked Mr. Craig about Ms. Grant's identity, Mr. Craig confirmed that Ms. Grant and her baby were not part of the order of protection against Defendant.

While Trooper Weiss prepared the warning ticket, Trooper Ent also asked Mr. Craig questions concerning Mr. Craig's reasons for coming to Springfield. Mr. Craig said that he was giving Defendant and Ms. Grant a ride to Springfield. Mr. Craig also said that Defendant and Ms. Grant were staying with Mr. Craig for a week. Later, Mr. Craig said he was going to

drive Ms. Grant and Defendant back to Chicago in a couple of days. Trooper Weiss told Mr. Craig he was free to go after completing the warning ticket. According to the warning ticket, Trooper Weiss issued the warning at 11:40 a.m. From the time Trooper Weiss stopped Mr. Craig to the time that Trooper Weiss told Mr. Craig he was free to go, the total duration of the stop was approximately twelve to fifteen minutes. This is also the point at which Trooper Weiss's audio visual recording equipment malfunctioned and ceased operation.

Once Trooper Weiss told Mr. Craig that Mr. Craig was free to leave, Trooper Weiss asked Mr. Craig if anything illegal was in the car and if Mr. Craig would let the Troopers search the vehicle. Mr. Craig answered no to both inquires. Trooper Weiss testified that he asked Mr. Craig these additional questions based on Mr. Craig's apparent nervousness during the traffic stop and the information Trooper Weiss had about Mr. Craig's suspected heroin distribution activities. Even though Mr. Craig did not consent to a search of the vehicle, Trooper Weiss decided that Mr. Craig's nervousness and suspected heroin distribution activities warranted further detention of Mr. Craig, Defendant, and Ms. Grant so that Zyko could perform a four to five minute long canine sniff around the vehicle. Trooper

Weiss told Mr. Craig to remain in Trooper Weiss's patrol car while Zyko performed the canine sniff.

At this point, Troopers Weiss and Ent approached the Dodge Charger with Zyko. Trooper Ent testified that he asked Defendant and Ms. Grant to step outside of the vehicle so that Zyko could perform a canine sniff around the car. Trooper Ent did not testify that he frisked Defendant or handcuffed Defendant while Zyko performed the canine sniff.

Conversely, Defendant testified that Trooper Ent removed Defendant from the rental vehicle, searched Defendant's person, handcuffed Defendant, and placed Defendant in the front seat of Trooper Ent's police vehicle before Zyko performed the canine sniff. Defendant said that he was placed in the front seat of Trooper Ent's vehicle because Zyko's cage was in the back of the vehicle.

Zyko, at Trooper Ent's command, performed the canine sniff and alerted on the passenger side of the vehicle. The alert indicated the presence of cannabis, cocaine, crack cocaine, methamphetamine, or heroin. According to Zyko's certification materials, these are the drugs that Zyko is trained to detect. Once Zyko alerted, Trooper Weiss told Mr. Craig that the Troopers were going to search the vehicle. Trooper Weiss testified that about five minutes elapsed from when Trooper Weiss told Mr. Craig that

Zyko would perform a canine sniff to when Zyko alerted.  Based on Trooper Weiss's testimony regarding the stop and the canine sniff, the encounter at issue lasted a total of seventeen to twenty minutes.  Defendant testified that the traffic stop and investigatory detention took approximately twenty to thirty minutes.

No drugs were found during the search of the vehicle.  However, the Troopers did recover a loaded Buck M.22 handgun in the trunk of the vehicle.  Both Mr. Craig and Defendant initially denied that the gun belonged to either of them.  Thereafter, the Troopers arrested both Mr. Craig and Defendant and took them to speak with Drug Enforcement Agency Special Agent Scott Giovannelli and Springfield Police Department Detective Grant Barksdale.  Agent Giovannelli and Detective Barksdale put Mr. Craig and Defendant in separate interview rooms.

At the evidentiary hearing, Agent Giovannelli testified that he read Defendant his rights under <u>Miranda</u> and asked Defendant if he understood those rights.  Agent Giovannelli testified that Defendant acknowledged understanding his rights.  Agent Giovannelli further testified that he and Detective Barksdale questioned Defendant and that Defendant, in a relaxed manner, told the officers that Defendant had come to Springfield to enroll in school, that he did not know Mr. Craig was involved in illegal drugs, and

admitted that the gun was his. Agent Giovannelli testified that the entire interview took approximately fifteen minutes. Agent Giovannelli also testified that during the interview, Defendant was neither threatened nor promised anything and that Defendant did not ask to stop the interview or ask to speak with an attorney. Agent Giovannelli stated that that Defendant did not appear distressed during the interview. Agent Giovannelli testified that he told Defendant the officers would tell the prosecutor if Defendant provided helpful information about Mr. Craig.

Contrary to Agent Giovannelli's testimony, Defendant testified that Agent Giovannelli, Trooper Weiss, and a third man interviewed him in two sessions. In the first session, Defendant told the officers that Defendant did not know that Craig was a drug dealer, that Defendant had come to Springfield to enroll in college, and that the gun found in the trunk was not his. Defendant also testified that, during the first interview session, Defendant told the officers to charge him if they wanted to and then he told the officers that he had nothing more to say.

Defendant testified that the officers left and then returned around ten or fifteen minutes later. Defendant testified that the officers said the charges "would stick" because Defendant was on parole and that

Defendant's "best bet" was to cooperate against Mr. Craig. Defendant testified that, at this point, he told the officers that the handgun was his.

Additionally, Defendant testified that the officers read him his rights under Miranda and that he "kind of" understood his rights but could not remember if he understood his rights when they were read to him. Defendant also testified that, even though he had been convicted in 2008 and 2012 on drug charges, the Chicago, Illinois police officers that arrested him on those occasions never administered Miranda warnings to Defendant.

At one point on cross-examination during the suppression hearing, Defendant testified that he admitted the gun was his before being read his rights under Miranda. Later during cross-examination, Defendant testified that the officers read Defendant his rights under Miranda before he admitted that the gun was his. Defendant admitted during the hearing that he owned the gun, had placed the gun in the car, and knew that possessing a firearm as a felon was wrong.

In the Motion to Suppress, Defendant challenged the lawfulness of the vehicle search and the length of the stop and investigatory detention. Defendant also argued that Trooper Ent improperly detained Defendant

while Zyko conducted a canine sniff.  Lastly, Defendant challenged the voluntariness of his admission that the firearm was his.

In the Report and Recommendation, Magistrate Judge Cudmore found that Defendant, as a passenger in the vehicle, did not have a reasonable expectation of privacy and, therefore, Defendant did not have standing to raise a Fourth Amendment challenge to the Troopers' search of the vehicle.  Magistrate Judge Cudmore also found that Trooper Weiss's fifteen-minute traffic stop and investigation of the order of protection against Defendant was reasonable in light of the information known to Trooper Weiss.  Magistrate Judge Cudmore then explained that an additional four or five minute investigatory detention was reasonable. Specifically, Magistrate Judge Cudmore found that the Troopers were justified in detaining Defendant, Mr. Craig, and Ms. Grant so that Zyko could perform a canine sniff because Trooper Weiss had received information concerning Mr. Craig's heroin distribution activities and because Mr. Craig had appeared nervous while in Trooper Weiss's vehicle. Furthermore, Judge Cudmore held that searching Defendant's person before the canine sniff and restraint of Defendant during the canine sniff was reasonable in light of Defendant's criminal history and the order of protection against Defendant, which demonstrated that Defendant might

be violent. Lastly, Magistrate Judge Cudmore found that Defendant voluntarily admitted that the gun was his after Defendant received and knowingly and intelligently waived his rights under <u>Miranda</u>.

## II.  <u>LEGAL STANDARD</u>

This Court must review <u>de novo</u> those portions of the Report and Recommendation to which timely objections are made. 28 U.S.C. § 636(b)(1). However, a district court can make credibility determinations based on the record developed by the Magistrate Judge. A <u>de novo</u> hearing is not required. <u>United States v. Raddatz</u>, 447 U.S. 667 (1980) (holding that the district court may "give to the magistrate's proposed findings of fact and recommendations 'such weight as [their] merit commands and the sound discretion of the judge warrants,' . . . so long as the ultimate decision is made by the district court") (internal citation omitted).

## III. <u>ANALYSIS</u>

On December 23, 2013, Defendant timely filed his Objections to the Report and Recommendation of the Magistrate Judge Cudmore (d/e 24). Defendant objects to Magistrate Judge Cudmore's findings regarding the search of the Dodge Charger, the length of the traffic stop and investigatory detention, the propriety of restraining Defendant during the investigatory detention, Defendant's waiver of his rights under <u>Miranda</u>, and the issue of

whether Defendant's statements were voluntary. After reviewing the Report and Recommendation, the Court DENIES Defendant's Objections and ADOPTS Magistrate Judge Cudmore's Report and Recommendation. Defendant's Motion to Suppress Statements and Evidence is DENIED.

## A. Defendant Lacks Standing to Challenge the Search of the Dodge Charger

Defendant first argues that the search of the Dodge Charger was unlawful. However, as a passenger in the car that Mr. Craig had rented, Defendant had no expectation of privacy in the contents of the car and, therefore, no standing to challenge the search of the vehicle. See <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978) (holding that passengers in a car which they neither owned nor leased could not challenge the legality of the search because those passengers did not have a legitimate expectation of privacy in the car). Therefore, as Magistrate Judge Cudmore found, Defendant cannot challenge the lawfulness of the Troopers' search of the Dodge Charger.

## B. The Traffic Stop and Investigatory Detention Were Not Unreasonably Lengthy

Defendant next seeks suppression of evidence of the firearm and his admission that the gun was his based on what Defendant contends was an

unreasonably lengthy stop and an unreasonably lengthy investigatory detention.

In this case, the traffic stop took place sometime between 11:00 a.m. and 12:00 p.m. on December 3, 2012. The stop occurred after Trooper Weiss clocked Mr. Craig driving 72 miles per hour in a 65 miles –per-hour speed zone. The stop consisted of Trooper Ent asking Mr. Craig questions about Mr. Craig's, Defendant's, and Ms. Grant's travel plans, Trooper Weiss asking Mr. Craig about the order of protection against Defendant, and Trooper Weiss issuing Mr. Craig a warning ticket for speeding. The warning was issued at 11:40 a.m. Troopers Ent's and Weiss's questions accomplished the purpose of the stop, and the time that the warning was issued is consistent with the Troopers' testimony regarding the timeline of the stop. See United States v. Muriel, 418 F.3d 720, 726 (7th Cir. 2005) (finding eighteen-minute traffic stop reasonable where officer asked a number of questions regarding the occupant's trip because the stop and questions only lasted long enough for the officer to accomplish the purpose of the stop). Accordingly, the Troopers did not act unreasonably by conducting a traffic stop that lasted approximately fifteen minutes.

The four-to-five-minute investigatory detention during the canine sniff was also reasonable in duration. Trooper Weiss knew that detectives

had purchased heroin from Mr. Craig and that the Springfield Police Department suspected Mr. Craig of transporting heroin to Springfield for distribution. Mr. Craig also appeared nervous while Trooper Weiss asked Mr. Craig questions about the order of protection against Defendant, and Mr. Craig gave conflicting stories to Trooper Ent regarding how long Defendant and Ms. Grant were staying with Mr. Craig in Springfield. These facts alone gave Troopers Weiss and Ent a reasonable basis to detain Defendant for four to five minutes to allow Zyko to conduct a canine sniff around the vehicle. See United States v. Martin, 422 F.3d 597, 602 (7th Cir. 2005) (finding that extended detention to conduct drug-sniffing investigation was not unreasonable because the defendant gave conflicting statements about his origin and destination and because officers had reason to believe the defendant was involved in drug trafficking).

During the canine sniff, Zyko, who had arrived with Trooper Ent shortly after Trooper Weiss pulled Mr. Craig over, alerted to the presence of drugs. This gave the Troopers probable cause to search the vehicle. The search yielded the firearm. The approximately fifteen-minute stop and five-minute investigatory detention that led to the discovery of the firearm were not unreasonable in duration.

**C.    The Alleged Unlawful Detention of Defendant During the Canine Sniff Does Not Warrant Suppression of the Evidence or Defendant's Admission that the Firearm Was His**

Defendant also challenges Magistrate Judge Cudmore's finding regarding the allegedly unlawful detention of Defendant during the canine sniff.  At the evidentiary hearing, Defendant testified that Trooper Ent searched Defendant's person before the canine sniff.  Defendant further testified that Trooper Ent handcuffed Defendant before placing Defendant alone in the front of Trooper Ent's police car during the canine sniff.  Defendant argues that this detention was unlawful because the detention amounted to an arrest without probable cause.  Defendant seeks suppression of evidence of the firearm and his admission that the gun was his because the Troopers recovered the firearm and Defendant made the incriminating statement following Trooper Ent's allegedly unlawful conduct.

Contrary to Defendant's testimony, Trooper Ent testified that he merely asked Defendant and Ms. Grant to get out of the vehicle while Zyko performed the canine sniff.  However, even if Defendant's testimony concerning the frisk and restraint is true, Trooper Ent's actions were justified.  The Troopers knew that Defendant had an order of protection against him indicating Defendant may be violent.  The Troopers also knew

that Defendant had a criminal history and was a passenger in a car with a suspected drug dealer.  Under these circumstances, Trooper Ent acted reasonably if he did search Defendant for weapons.  Trooper Ent also acted reasonably if he handcuffed Defendant before placing Defendant alone in the front seat of Trooper Ent's vehicle during the four-to-five-minute canine sniff.  See United States v. Bullock, 632 F.3d 1004, 1016 (7th Cir. 2011) (finding frisk and restraint of suspect with handcuffs in back of police car during investigatory detention reasonable because the crime being investigated involved drugs and explaining that drug crimes are associated with dangerous and violent behavior and warrant a higher degree of caution).

### D.    The Officers Did Not Coerce Defendant's Admission that the Firearm Was His

Additionally, Defendant concedes in his brief that he received the Miranda warnings.  Defendant argues, however, that he involuntarily admitted the gun was his and, therefore, his admission should be suppressed.

To be involuntary, a confession must be the product of police coercion.  United States v. Gillaum, 372 F.3d 848, 856 (7th Cir. 2004). Coercion is analyzed from the perspective of a reasonable person in the

suspect's position.  <u>United States v. Huerta</u>, 239 F.3d 865, 871 (7th Cir.

2001).

Here, Defendant has not established that his admission was coerced

by the interrogating officers and, therefore, involuntary.  At most,

Defendant has established that the officers interviewing Defendant

promised to speak with the prosecutor if Defendant gave the officers any

incriminating information about Mr. Craig.  Such promises do not render

Defendant's admission involuntary.  <u>See</u> <u>United States v. Villalpando</u>, 588

F.3d 1124, 1130 (7th Cir. 2009) ("Promises to seek favorable consideration

from the prosecutor do not undermine the voluntariness of a confession.").

**E.     Agent Giovannelli Administered the <u>Miranda</u> Warnings to
        Defendant Before Defendant Knowingly and Intelligently
        Waived His Rights Under <u>Miranda</u> and Admitted that the
        Firearm Was His**

Defendant also raised issues in his testimony concerning the receipt,

waiver, and invocation of his rights under <u>Miranda</u>.  Specifically, Defendant

testified that he received the <u>Miranda</u> warnings after admitting the gun was

his.  Defendant also testified that he did not fully understand the <u>Miranda</u>

warnings and that the officers disregarded Defendant's invocation of his

right to remain silent.  Defendant did not raise these issues in his Motion to

Suppress or the accompanying briefs.

On cross-examination during the suppression hearing, Defendant testified that he admitted the gun was his before he received the <u>Miranda</u> warnings. Only a moment later, Defendant said that he received the warnings before admitting he owned the firearm. Based on these inconsistencies in Defendant's testimony, Magistrate Judge Cudmore properly discredited Defendant's testimony that he received the <u>Miranda</u> warnings after admitting the gun was his. Accordingly, Defendant's argument that the officers did not Mirandize Defendant until after he made the incriminating statement does not support suppression of Defendant's incriminating statement.

Defendant also testified that he "kind of" understood his rights under <u>Miranda</u> before waiving those rights. Based on this testimony, Defendant argues that his admission should be suppressed because the waiver of his <u>Miranda</u> rights was not knowing and intelligent.

When Defendant was asked during the suppression hearing whether he understood his rights at the time Agent Giovannelli administered the <u>Miranda</u> warnings, Defendant testified that he was not sure if he understood the warnings when he was Mirandized because he could not remember whether he understood his rights at that time. However, Defendant did not give any reason why he did not understand his rights. In

fact, Defendant also testified that he invoked his right to remain silent. Defendant's testimony that he did not understand his rights under <u>Miranda</u> but that he invoked his rights under <u>Miranda</u> is an important inconsistency. Accordingly, the Court finds that Defendant understood his rights under <u>Miranda</u> and, therefore, knowingly and intelligently waived those rights.

Defendant also testified that he invoked his right to remain silent when he told officers to go ahead and charge him and that he had nothing else to say. Defendant argues that his admission that the firearm was his should be suppressed because the officers continued the interview after he invoked his right to remain silent.

Defendant's testimony is inconsistent with the testimony of Agent Giovannelli who testified that Defendant simply admitted the firearm was his. However, even if Defendant told officers that he had nothing else to say, Defendant's statement was not an unambiguous invocation of his right to remain silent. <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 381 (2010) (holding that a suspect must unambiguously invoke his right to remain silent before police must stop the interrogation). In <u>United States v. Sherrod</u>, when an officer began administering the <u>Miranda</u> warnings to the defendant, the defendant told the officer "I'm not going to talk about nothing" and "I'm not gonna talk about nothing—if you'd give me a picture

of what's going on, but I ain't gonna talk about shit."  445 F.3d 980, 982 (7th Cir. 2006).  The officer  then completed the <u>Miranda</u> warnings, and the defendant executed a waiver of his rights under <u>Miranda</u>.  <u>Id.</u>  Afterward, the defendant made incriminating statements during an interview that lasted about ten minutes.  <u>Id.</u>

After a hearing on the defendant's motion to suppress, the district court concluded that the defendant had not unambiguously invoked his right to remain silent.  <u>Id.</u>  On appeal, the Seventh Circuit Court of Appeals affirmed, explaining that a suspect telling an officer that he is "not going to talk about nothing" could easily be construed as an invocation of the right to remain silent or as a taunt or even a provocation for the officer to continue questioning.  <u>Id.</u>  The court explained further that if the defendant wanted to end the interview, then the defendant knew how to do so unambiguously.  <u>Id.</u>

In this case, Defendant testified that he initially told the interviewing officers that the gun was not his.  Defendant then told the officers to go ahead and charge him if they wanted to because he had nothing else to say. Defendant testified that he told the officers that the gun was not his because he did not think he could be charged for being a felon in possession of the firearm.

Defendant's statement could be construed as an invocation of his right to remain silent. However, in the context of the interview, Defendant's statement may also be construed as an angry response to questioning in light of Defendant's belief that he could not be charged with felon in possession of a firearm. See United States v. Banks, 78 F.3d 1190, 1197-98 (7th Cir.), vacated on other grounds by Mills v. United States, 519 U.S. 990, 117 S.Ct. 478, 136 L.Ed.2d 373 (1996) (finding no unambiguous invocation of the defendant's right to remain silent where the defendant's comment "I don't got nothing to say" could be viewed as an invocation of his right to remain silent or merely an angry response to the police placing a Miranda waiver form in front of the defendant).

If Defendant wanted to stop the interview by asserting his right to remain silent, then he needed to do so in unambiguous terms. Defendant did not. Accordingly, even if Defendant's testimony is accepted as true, the officers were not required to cease questioning because Defendant's statement that he had nothing more to say was not an unambiguous invocation of his right to remain silent.

## IV.  CONCLUSION

**For the reasons stated, Magistrate Judge Cudmore's Report and Recommendation (d/e 22) is ADOPTED. Accordingly,**

**Defendant's Motion to Suppress Evidence and Statements (d/e 17) is DENIED.**

**IT IS SO ORDERED.**

ENTER: January 3, 2014

FOR THE COURT:                    <u>s/ Sue E. Myerscough</u>
                                  SUE E. MYERSCOUGH
                                  UNITED STATES DISTRICT JUDGE